Filed 7/14/22  P. v. Jones CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEPFON JONES,<br><br>    Defendant and Appellant. | F083258<br><br>(Super. Ct. No. BF159975A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Poochigian, Acting P. J., Smith, J. and Snauffer, J.

## STATEMENT OF APPEALABILITY

This trial court's order is appealable pursuant to Penal Code section 1237, subdivision (b),[1] which authorizes an appeal "[f]rom any order made after judgment affecting the substantial rights of the party." (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 597; *People v. Martinez* (2019) 31 Cal.App.5th 719, 729.)

## STATEMENT OF THE CASE

In the underlying case, appellant Stepfon Jones was charged with premeditated murder (Pen. Code, § 187, subd. (a); count 1); assault on a child under age eight resulting in death (§ 273ab, subd. (a); count 2); and felony child endangerment (§ 273a, subd. (a); count 3).

In May 2017, a jury found appellant guilty of counts 2 and 3, and the lesser offense of second degree murder in count 1. On June 27, 2017, the trial court sentenced appellant to 25 years to life in prison on count 2, and a consecutive six-year sentence on count 3. The trial court stayed the term of count 1 pursuant to section 654.

Appellant appealed. On September 18, 2020, this Court affirmed. (*People v. Jones* (Sept. 18, 2020, F075895) [nonpub. opn.].)

In September 2018, Governor Brown signed into law Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 4). That bill, effective on January 1, 2019, added section 1170.95 to the Penal Code. Former Section 1170.95 (now § 1172.6)[2] created a procedure for certain defendants convicted of felony murder or murder on a natural and probable consequences theory to return to court and, depending on the facts of their cases, receive relief.

---

[1] Subsequent statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

On June 21, 2021, appellant filed a Petition for Resentencing, contending that he was entitled to relief under section 1170.95. He further requested an attorney be appointed.

On June 25, 2021, defense counsel was appointed to represent appellant. On July 14, 2021, the Kern County District Attorney filed opposition to the petition for failure to make a prima facie showing of eligibility. On August 18, 2021, defense counsel filed a reply to the District Attorney's opposition. On August 26, 2021, the trial court denied the petition by written order. Appellant filed a timely Notice of Appeal.

## STATEMENT OF FACTS[3]

On April 25, 2015, at approximately 9:30 p.m., two officers were dispatched to an apartment in Bakersfield where J.J. (mother) was trying to revive her four-month-old son, S., with CPR. S., who was not breathing and had no pulse, had a two-inch long oval-shaped bruise on his forehead above his left eye. When the officer asked what had happened, mother said she tried to take S. out of his swing to change his diaper and accidently struck his head against the base of the swing, causing S. to have a seizure and stop breathing. The officer did not believe mother's story, knowing the injuries could not have happened as the result of an accidental bump on a baby swing. Fifteen minutes later, appellant arrived at the apartment.

At the time, mother and appellant lived together with their two-year-old daughter, Z., and infant S. in a two-bedroom apartment they shared with appellant's brother and his family. S. slept in a baby swing in the one bedroom, along with Z. on a mattress on the floor and mother and appellant shared a bed. Mother described appellant as happy about S.'s birth, but when he began to cry a lot at age two to three months, appellant became

---

[3] This statement of facts is quoted from this Court's September 18, 2020 decision, which, in turn, was the sole basis for the trial court's denial of appellant's section 1170.95 petition.

frustrated. When mother would pick S. up to comfort him, appellant would tell her to put him down and let him cry as "He's a boy," and "You're not supposed to hold him."

Testifying about the events before calling 911, mother stated that on the evening of April 24, 2015, she was home with the two children while appellant was out. S. had been running a slight fever and finally went to sleep. When appellant returned home at about 10:00 p.m., everyone was asleep and appellant went to bed. Around midnight, S. woke up and started screaming in pain. Mother got up, grabbed S. and tried to give him a pacifier and bottle. She rocked him and tried to distract him, but nothing worked. He eventually fell asleep and mother put him back in his swing. But 10 minutes later, S. woke again and began crying. Appellant told mother to "[s]hut him up" and make him be quiet.

Appellant then got up, shut the bedroom door and grabbed S. and started shaking him and telling him to "shut up." Mother yelled at appellant to stop, saying he was going to hurt S. and "kill him." But appellant did not stop, even though S. was no longer crying. Appellant dropped S. on the ground, and when mother went to pick him up, appellant pushed her away. He then kicked S., "[l]ike he was kicking a football", against the wall.

S.'s head hit the wall above the electrical outlet, and he fell onto the mattress where Z. was sleeping, which woke her. When mother picked S. up, his nose was bleeding uncontrollably and his head was not straight. Mother did not call 911, but as time passed, she told appellant they should take S. to the hospital. Appellant refused, saying he did not want people asking what had happened to S. He specifically instructed her not to tell the police what had happened.

Mother tried to take care of S., but he could not suck on a bottle and he breathed with difficulty. His fists were clenched and would not open. Although she knew she should take S. to the hospital, she did not because she was "scared."

4.

The following morning, mother again told appellant they should take S. to the hospital, but he said that was "not going to happen." Appellant left with his brother later in the afternoon. He did not return. That night, S. stopped breathing and mother called 911. Law enforcement and paramedics arrived, administered CPR and transported S. to the hospital. Mother followed. Before departing, Mother told detectives she was picking up S. from a small baby swing and accidentally hit his head on one of the swing's arms.

At the hospital, Mother's grandmother advised mother to tell the truth, which she subsequently did by telling detectives what actually happened. Mother said she initially lied to officers about the incident because she was fearful that Child Protective Services (CPS) would remove Z. from her. Mother and appellant had both had prior incidents with CPS, and mother would be required to take parenting and substance abuse classes in order to keep her children.

Mother was charged with felony child abuse, but later entered into an agreement in which she pled no contest to the charge and received one year in jail and five years felony probation. As part of the agreement, she was required to testify against appellant at trial. On cross-examination, mother acknowledged that she, individually, had been investigated by CPS in December 2014.

As part of her testimony, mother testified that she and appellant had a difficult relationship and that he was often jealous if anyone would speak to her, he was physically abusive towards her, and he had also been physically abusive with Z., slapping and punching her on her arms, face, back and legs and telling her to "shut up." Mother did not report this behavior because she was scared of appellant. Mother had known appellant since she was 14 or 15; at the time of the fatal incident involving S., she was 19 years old. At times, mother would leave appellant but return when he promised to change. She reported him to the police in 2013 for abusing her and again in March of 2014. She estimated that, between early 2012 and April of 2015, appellant physically abused her on 20 or 30 separate occasions and hit Z. 10 to 20 different times.

5.

Mother testified to an incident that occurred in August 2013 when she and Z. were staying with mother's grandmother. Appellant broke into grandmother's house, when he was drunk, in an effort to see mother and Z. During the incident, grandmother slipped on the front doorstep and fell. After mother helped grandmother up, appellant kicked the door as grandmother was trying to go back into the house, trapping her arm in the door frame as he did so. Mother and Z. hid from appellant in the bathroom, but appellant broke down the door, "nudged" mother's head and left. An officer who responded to the 911 call on the incident found grandmother's right wrist severely swollen and the metal security door indented, as if it had been kicked. The locking mechanism to the bathroom door had been ripped off. Appellant was subsequently convicted of elder abuse.

Grandmother testified that she had witnessed appellant act aggressive and controlling over mother. On one occasion, he came to her house and destroyed the front door to get mother's attention. Appellant called mother "very ugly" names and threatened both mother and grandmother.

The officer who responded to mother's 911 call in March of 2014, spoke to mother, who said appellant shoved her, slapped her, and pulled her hair as she was trying to leave the apartment. The next day, appellant admitted to another officer that he had pushed mother once or twice during the argument.

Appellant's mother testified that she had called 911 in 2013 when she witnessed appellant hitting mother in the face and body after the two had an argument. The officer who responded to the scene viewed visible redness and swelling on mother's face.

Appellant's brother, who lived in the same apartment as mother and appellant, saw appellant push mother while the two were arguing, and had seen appellant "blow up" at mother on prior occasions.

An autopsy determined S. died from blunt force head and neck trauma. He had several fractures of the skull, suffered multiple hemorrhages underneath the scalp, and several retinal and optic nerve sheath hemorrhages confirmed he had been shaken. The

6.

forensic pathologist opined that the injuries could not have been suffered accidentally, and likened them to the type suffered by persons in traffic collisions. The injuries were fresh and acute and of the same age.

Appellant spoke to officers in the early morning of April 26, 2015, a recorded interview of which was played for the jury. After he was read his *Miranda* rights, appellant claimed "It wasn't on purpose," but that he and mother were arguing and he grabbed S., tripped over a chair, and they both fell to the ground "hard." He later agreed that he did not accidentally trip with S., but that he threw S. down in anger. He admitted shaking S. "a little." When asked if anyone overheard him say anything while this was taking place, appellant said he probably said "shut up or something," but then again said "[i]t wasn't on purpose though." Appellant also admitted that he "kind of hit [S.] a little bit" and gave him "one little kick" "a little bit hard" with his foot, causing S. to fly over Z. on her mattress and hit the wall.

Appellant acknowledged having hit S. "a little" three or four times on his head a few days earlier because he was crying. He admitted hitting Z. before, but "not like that," only that he would "whoop her" when she did not listen.

Appellant admitted pushing mother "a little bit" when he took S. from her. He admitted threatening to shoot her, but he explained he had told her that a long time ago and he was not serious.

After appellant kicked S., S. started bleeding from his nose, which scared both appellant and mother. Neither did anything about it, other than to clean up the blood with towels appellant later threw away.

Appellant told the interviewing detective that he was on SSI for "being … kinda slow and I can't read …, that's about all I know." When asked if he could have made a different choice that night and not beaten S., appellant said, "[c]ould of" and "I know I should of." Appellant admitted that throwing and kicking S. were bad choices and that he should have "[j]ust walked off."

Appellant acknowledged that mother had wanted to call 911 right away after everything happened, but he asked her "[W]hat are we gonna tell 'em?" Mother said she did not know. No call was made to 911. Appellant agreed that his worry of getting into trouble was stronger than him wanting to help his son. Appellant denied mother had done anything to cause the injury.

The following day, a social worker interviewed appellant at the jail after Z. had been placed into protective custody. The recorded interview was played for the jury. Appellant again admitted shaking, dropping and kicking S. Appellant thought he might have been drunk when he got mad at S.

*Defense*

Appellant blamed the incident on mother, citing her stories to the paramedics and officers who responded to the scene. Mother acknowledged she had told grandmother, on the way to the police station, that she was the one who struck S.'s head on the swing right before she called 911.

Appellant's father testified that he, like appellant, had learning disabilities and were both clients at the Regional Center. Appellant's father testified that appellant had trouble with basic daily tasks, such as maintaining his personal hygiene.

In November 2016, a clinical psychologist, Nicanor S. Garcia, evaluated appellant for intellectual disabilities. Appellant appeared to be his stated age of 22 years, but was somewhat "slow and subdued" in his presentation and had a flat affect. While appellant was able to count from two to 20, he skipped a few numbers. He had difficulty spelling words like "cat" and "world" backwards. Appellant was able to remember two of the three memory words the psychologist had earlier told him. He could read some words, but was unable to explain simple proverbs.

Appellant knew who the current president was, but had slow auditory processing. He had an IQ of 59, which was in the .3 percentile and 41 points below average. Appellant had IQ tested in the same range at age 10 and was diagnosed with mild mental

retardation. Dr. Garcia diagnosed appellant with "[i]ntellectual disability" "[m]ild in degree or severity." The psychologist believed appellant had limited ability to communicate, reason, problem solve, and plan. He also had limited ability to take care of himself and conceptualize everyday events.

## DISCUSSION

We have elected to independently review the entire record as urged by appellant's counsel in this case, consistent with the opinions in *People v. Gallo* (2020) 57 Cal.App.5th 594, 598, and *People v. Flores* (2020) 54 Cal.App.5th 266, 269.

In denying appellant's petition for resentencing pursuant to section 1170.95, the trial court explicitly found that appellant had failed to make a prima facie case for relief under section 1170.95, subdivision (c), because, as the actual killer, appellant was statutorily ineligible for relief.[4] The trial court specifically relied upon this Court's opinion affirming appellant's underlying convictions.

Appellant's brief, the facts as set forth in the underlying case, and the record of conviction are universally in agreement that appellant was the actual killer in this case. The trial court's finding was based on appropriate evidence in conformance with our Supreme Court's opinion in *People v. Lewis* (2021) 11 Cal.5th 952, 970—972.

## APPELLATE COURT REVIEW

Appellant's appointed appellate counsel has filed an opening brief that summarizes the pertinent facts, raises no issues, and requests this court to review the record independently. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) The opening brief also includes the declaration of appellate counsel indicating appellant was advised he could file his own brief with this court. By letter on December 7, 2021, we invited appellant to submit additional briefing. To date, he has not done so.

---

[4] Section 189, subdivision (e)(1).

9.

On March 4, 2022, this Court issued an order permitting appellate counsel to strike appellant's brief filed under *Wende, supra,* 25 Cal.3d 436, and to instead file an appellant's opening brief if counsel determined that recently enacted legislative changes to the law were applicable to appellant's case. By letter of March 5, 2022, appellant's counsel informed the court that she had determined not to submit any further briefing in this case.

Having undertaken an examination of the entire record, we find no evidence of ineffective assistance of counsel or any other arguable error that would result in a disposition more favorable to appellant.

## DISPOSITION

The order denying appellant's petition for resentencing is affirmed.